**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

|  |  |
|---|---|
| MARK GOWLAND,<br>1914 W McKINNEY STREET<br>HOUSTON, TX 77019<br>Derivatively on Behalf of COLONY<br>CAPITAL, INC.,<br><br>       Plaintiff,<br><br>    vs.<br><br>THOMAS J. BARRACK, JR.,<br>515 SOUTH FLOWER STREET<br>44TH FLOOR<br>LOS ANGELES, CA 90071<br>SERVE ON: CSC-LAWYERS<br>INCORPORATING SERVICE COMPANY<br>7 ST. PAUL STREET, SUITE 820<br>BALTIMORE MD 21202<br><br>DOUGLAS CROCKER II,<br>515 SOUTH FLOWER STREET<br>44TH FLOOR<br>LOS ANGELES, CA 90071<br>SERVE ON: CSC-LAWYERS<br>INCORPORATING SERVICE COMPANY<br>7 ST. PAUL STREET, SUITE 820<br>BALTIMORE MD 21202<br><br>NANCY A. CURTIN,<br>515 SOUTH FLOWER STREET<br>44TH FLOOR<br>LOS ANGELES, CA 90071<br>SERVE ON: CSC-LAWYERS<br>INCORPORATING SERVICE COMPANY<br>7 ST. PAUL STREET, SUITE 820<br>BALTIMORE MD 21202<br><br>JON A. FOSHEIM,<br>515 SOUTH FLOWER STREET<br>44TH FLOOR<br>LOS ANGELES, CA 90071 | Civil Action No.:<br><br>**VERIFIED SHAREHOLDER**<br>**DERIVATIVE COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

#3156339v.1

SERVE ON: CSC-LAWYERS                       )
INCORPORATING SERVICE COMPANY               )
7 ST. PAUL STREET, SUITE 820                )
BALTIMORE MD 21202                          )
                                            )
JUSTIN E. METZ,                             )
515 SOUTH FLOWER STREET                     )
44TH FLOOR                                  )
LOS ANGELES, CA 90071                       )
SERVE ON: CSC-LAWYERS                       )
INCORPORATING SERVICE COMPANY               )
7 ST. PAUL STREET, SUITE 820                )
BALTIMORE MD 21202                          )
                                            )
GEORGE G. C. PARKER,                        )
515 SOUTH FLOWER STREET                     )
44TH FLOOR                                  )
LOS ANGELES, CA 90071                       )
SERVE ON: CSC-LAWYERS                       )
INCORPORATING SERVICE COMPANY               )
7 ST. PAUL STREET, SUITE 820                )
BALTIMORE MD 21202                          )
                                            )
RICHARD B. SALTZMAN,                        )
515 SOUTH FLOWER STREET                     )
44TH FLOOR                                  )
LOS ANGELES, CA 90071                       )
SERVE ON: CSC-LAWYERS                       )
INCORPORATING SERVICE COMPANY               )
7 ST. PAUL STREET, SUITE 820                )
BALTIMORE MD 21202                          )
                                            )
CHARLES W. SCHOENHERR,                      )
515 SOUTH FLOWER STREET                     )
44TH FLOOR                                  )
LOS ANGELES, CA 90071                       )
SERVE ON: CSC-LAWYERS                       )
INCORPORATING SERVICE COMPANY               )
7 ST. PAUL STREET, SUITE 820                )
BALTIMORE MD 21202                          )
                                            )
JOHN A. SOMERS, and                         )
515 SOUTH FLOWER STREET                     )
44TH FLOOR                                  )
LOS ANGELES, CA 90071                       )
                                            )

2

| | |
|---|---|
| SERVE ON: CSC-LAWYERS | ) |
| INCORPORATING SERVICE COMPANY | ) |
| 7 ST. PAUL STREET, SUITE 820 | ) |
| BALTIMORE MD 21202 | ) |
| | ) |
| JOHN L. STEFFENS, | ) |
| 515 SOUTH FLOWER STREET | ) |
| 44TH FLOOR | ) |
| LOS ANGELES, CA 90071 | ) |
| SERVE ON: CSC-LAWYERS | ) |
| INCORPORATING SERVICE COMPANY | ) |
| 7 ST. PAUL STREET, SUITE 820 | ) |
| BALTIMORE MD 21202 | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and, | ) |
| | ) |
| COLONY CAPITAL, INC., formerly known | ) |
| as COLONY NORTHSTAR, INC. | ) |
| 515 SOUTH FLOWER STREET | ) |
| 44TH FLOOR | ) |
| LOS ANGELES, CA 90071 | ) |
| SERVE ON: CSC-LAWYERS | ) |
| INCORPORATING SERVICE COMPANY | ) |
| 7 ST. PAUL STREET, SUITE 820 | ) |
| BALTIMORE MD 21202 | ) |
| | ) |
| Nominal Defendant. | ) |

Plaintiff Mark Gowland ("Plaintiff"), by and through his undersigned counsel, derivatively

on behalf of Nominal Defendant Colony Capital, Inc., formerly known as Colony NorthStar, Inc.

("Colony" or the "Company"), submits this Verified Shareholder Derivative Complaint (the

"Complaint").  Plaintiff's allegations are based upon his personal knowledge as to himself and his

own acts, and upon information and belief, developed from the investigation and analysis by

Plaintiff's counsel, including a review of publicly available information, including filings by

Colony with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports,

3

analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Colony against certain of its officers and directors seeking to remedy the Director Defendants' (as defined below) breach of fiduciary duties and gross mismanagement that occurred from January 10, 2017 to the present (the "Relevant Period") and have caused substantial harm to the Company.

2.      Colony operates as a real estate investment trust. The Company invests in healthcare, industrial, and hospitality sectors, as well as offers equity and debt management services. Colony serves customers globally. The Company resulted from the January 2017 merger of three entities: Colony Capital, Inc. ("Colony Capital"); NorthStar Asset Management Group Inc. ("NorthStar Asset"); and NorthStar Realty Finance Corp. ("NorthStar Realty").

3.      After this merger and on June 25, 2018, Colony completed a name change from Colony NorthStar, Inc. to Colony Capital, Inc., by filing Articles of Amendment to its charter on June 22, 2018.  In addition to this name change, Colony's Class A common stock trading symbol changed from "CLNS" to "CLNY."

4.      Throughout the Relevant Period, Defendants made materially false and misleading statements regarding the Company's business, operational, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Colony's Healthcare and Investment Management segments were performing worse than reported; and (ii) as a result, Colony's public statements were materially false and misleading at all relevant times.

5.      On March 1, 2018, Colony reported its financial and operating results for the quarter and year ended December 31, 2017, announcing a goodwill impairment of $375 million

4

attributable to the Company's Healthcare and Investment Management segments.

6.      On this news, Colony's share price fell $1.78, or 22.88%, to close at $6.00 on March 1, 2018.

## PARTIES

### Plaintiff

7.      *Plaintiff Gowland* is, and was at relevant times, a shareholder of Colony.  Plaintiff Gowland will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.  Plaintiff is a citizen of the State of Texas.

### Nominal Defendant

8.      *Nominal Defendant Colony* is incorporated in Maryland, and the Company's principal executive offices are located at 515 South Flower Street, 44th Street, Los Angeles, California 90071.  Colony's securities now trade on the NYSE under the ticker "CLNY".

### Director Defendants

9.      *Defendant Thomas J. Barrack, Jr.* ("Barrack") was, at all relevant times herein, Director and Executive Chairman of the Company.   Upon information and belief Defendant Barrack is a citizen of California.

10.      *Defendant Richard B. Saltzman* ("Saltzman") was, at all relevant times herein, Director, President and Chief Executive Officer of the Company.  Upon information and belief Defendant Saltzman is a citizen of New York.

11.      *Defendant Douglas Crocker II* ("Crocker") was, at all relevant times herein, a Director of the Company.  Crocker is also a member of Colony's Audit and Risk Committees. Upon information and belief Defendant Crocker is a citizen of Massachusetts.

12.      *Defendant Nancy A. Curtin* ("Curtin") was, at all relevant times herein, a Director

of the Company.   Curtin is a member of Colony's Risk Committee and its Compensation Committee.  Upon information and belief Defendant Curtin is a citizen of United Kingdom.

13.     *Defendant Jon A. Fosheim* ("Fosheim") was, at all relevant times herein, a Director of the Company.  Fosheim is also a member of Colony's Audit Committee and is its Chair of the Nominating and Corporate Governance Committee.  Upon information and belief Defendant Fosheim is a citizen of California.

14.     *Defendant Justin E. Metz* ("Metz") was, at all relevant times herein, a Director of the Company.  Metz is a member of Colony's Risk Committee and Nominating and Corporate Governance Committee.  Upon information and belief Defendant Metz is a citizen of New York.

15.     *Defendant George G. C. Parker* ("Parker") was, at all relevant times herein, a Director of the Company.  Parker is the Chair of Colony's Audit Committee and is a member of its Compensation Committee.  Upon information and belief Defendant Parker is a citizen of California.

16.     *Defendant Charles W. Schoenherr* ("Schoenherr") was, at all relevant times herein, a Director of the Company.  Schoenherr is a member of Colony's Audit Committee and its Compensation Committee.  Upon information and belief Defendant Schoenherr is a citizen of Connecticut.

17.     *Defendant John A. Somers* ("Somers") was, at all relevant times herein, a Director of the Company.  Somers is Chair of Colony's Risk Committee and is a member of its Nominating and Corporate Governance Committee.   Upon information and belief Defendant Somers is a citizen of New Jersey.

18.     *Defendant John L. Steffens* ("Steffens") was, at all relevant times herein, a Director of the Company. Steffens is Chair of Colony's Compensation Committee and is a member

6

of its Nominating and Corporate Governance Committee.  Upon information and belief Defendant Steffens is a citizen of New Jersey.

19.     Defendants Barrack, Saltzman, Crocker, Curtin, Fosheim, Metz, Parker, Schoenherr, Somers, and Steffens are collectively referred to herein as the "Director Defendants."

**Non-Party Officers and Directors**

20.     Darren J. Tangen ("Tangen") is an Executive Vice President and the Chief Financial Officer and Treasurer of Colony. In addition, Mr. Tangen has served on the Board of Directors of Colony NorthStar Credit Real Estate, Inc. (NYSE: CLNC) since January 2018. Since 2002, Mr. Tangen has held various senior investment related roles at Colony, including Executive Director and Chief Financial Officer.

21.     David T. Hamamoto ("Hamamoto") was, from the completion of the merger until his resignation became effective on January 11, 2018, Colony's Executive Vice Chairman and a director.

22.     Neale W. Redington ("Redington") is a Managing Director and the Chief Accounting Officer of Colony, having previously held the same positions at Colony Capital, Inc.. Mr. Redington is responsible for financial accounting and reporting for firm-sponsored investments and related affiliates and subsidiaries. In addition, Mr. Redington has served as Chief Accounting Officer of Colony NorthStar Credit Real Estate, Inc. (NYSE: CLNC) since January 2018.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1331 because Plaintiff and Defendants have diverse citizenship.

24.     The Court has jurisdiction over each defendant because each defendant is either a

corporation that does sufficient business in Maryland or is an individual who has sufficient minimum contacts with Maryland so as to render the exercise of jurisdiction by Maryland courts permissible under traditional notions of fair play and substantial justice.

25.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the defendants either resides in or maintains executive offices in this District, including Nominal Defendant Colony, a substantial portion of the transactions and wrongs complained of herein - including Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting in violations of fiduciary duties owed to Colony - occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

26.    In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## DUTIES OF THE DIRECTOR DEFENDANTS

27.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Colony, the Director Defendants owed Colony and its investors the obligation to act in good faith, in a manner the director reasonably believes to be in the best interests of the corporation and with the care that an ordinarily prudent person in a like position would use under similar circumstances ("director duties").  The obligations required the Director Defendants to use their utmost abilities to control and manage Colony in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of Colony and its investors.

8

28.     Each director of the Company owes to Colony and its investors the director duties in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

29.     To discharge their director duties, the officers and directors of Colony were required to exercise reasonable and prudent supervision over the management, policies, practices, and control of the affairs of the Company.  By virtue of such duties, the officers and directors of Colony were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how Colony conducted its operations, and, upon

9

receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

30.     Each of the Director Defendants, by virtue of his/her position as a director and/or officer, owed to the Company and to its shareholders the director duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Colony, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

31.     The Director Defendants breached their director duties by causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, Colony has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## CORPORATE GOVERNANCE

32.     As members of Colony's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business and assuring the integrity of its financial and business records.

33.     Colony maintains a Code of Business Conduct and Ethics. As stated therein, this Code applies to Colony's Directors as well as its other employees.  It requires that each person conduct himself in an honest and ethical manner, and comply with all applicable laws, rules and regulations.  Regarding public disclosures, it provides:

**Public Disclosure**

The Company is committed to providing full, fair, accurate, timely and understandable disclosure in the current reports, periodic reports and other information it files with or submits to the SEC and in other public communications, such as press releases, earnings conference calls and industry conferences, made by the Company or on the Company's behalf. In meeting such standards for disclosure, the Company's officers and directors shall at all times strive to comply 6 of 12 with the Company's disclosure obligations and, as necessary, appropriately consider and balance the need or desirability for confidentiality with respect to non-public negotiations or other business developments.

The Company's Chief Executive Officer and Chief Financial Officer are responsible for establishing effective disclosure controls and procedures and internal control over financial reporting within the meaning of applicable SEC rules and regulations. The Company expects the Chief Executive Officer and the Chief Financial Officer to take a leadership role in implementing such controls and procedures and to position the Company to comply fully with its disclosure obligations within the timeframe required under applicable SEC rules and regulations.

No Covered Person should interfere with, hinder or obstruct the Company's efforts to meet the standards for public disclosure set forth above. In addition, all Covered Persons must strictly adhere to the Company's system of internal disclosure controls, including by promptly reporting (i) any event or occurrence that arises in the course of their duties that may have a material impact on the Company's financial condition or operations and (ii) any actual or suspected breaches of the Company's internal control procedures.

34.     Colony also maintains a separate Code of Ethics for Principal Executive Officer

#3156339v.1

and Senior Financial Officers.  This Code reemphasizes that each covered person (which is defined therein) must conduct himself in an honest and ethical manner, and comply with all applicable laws, rules and regulations.  Regarding this Code's requirement of "full, fair, accurate, timely, and understandable disclosure[,]" it states in part:

> The Covered Officers share responsibility for full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the SEC and in other public communications, such as press releases, earnings conference calls and industry conferences made by or on behalf of the Company.

35.    Colony maintains a Risk Committee that was formed and members appointed in February 2017.  The Risk Committee Charter provides in relevant part:

**Purpose**

> The principle purposes of the Risk Committee (the "Risk Committee") of the Board of Directors (the "Board") of Colony Capital, Inc. (the "Company") shall be to (i) oversee the enterprise risk management program in place at the Company and (ii) evaluate risk in relation to the potential for growth and increase in shareholder value. The Risk Committee's oversight responsibility includes the following:
>
> - the enterprise-wide risk management policies of the Company's operations;
> - structure, approach and operation of the Company's risk-management framework; and
> - review and approve the Board's risk appetite parameters to be used by management to operate the Company.
>
> The Risk Committee shall perform duties and responsibilities with appropriate consideration of all risk types including, but not limited to, compliance/regulatory risk, credit risk, valuation risk, market risk, liquidity risk, operational risk, legal risk, reputational risk, and strategic risk.
>
> *        *        *
>
> **Committee Powers, Duties and Responsibilities**
>
> 1. <u>Oversee Risk Management Function and Policies</u>. The Risk Committee shall review the Company's risk management infrastructure and the critical risk management policies. Policies will be reviewed annually and, if considered appropriate, recommend new/updated policies to the Board for approval.
> 2. <u>Evaluate Company Risk Appetite</u>. The Risk Committee shall review and consider with management the Company's risk profile, risk appetite and

12

approach to determining the acceptability of risks incurred in the course of
pursuing business.

3. <u>Monitor Risk Exposures</u>. The Risk Committee shall review and evaluate the
Company's significant financial, non-financial and cybersecurity risk
exposures, and how the exposures are measured, monitored and managed in
compliance with applicable policies.

4. <u>Legal and Regulatory Compliance, Litigation</u>. The Risk Committee shall
periodically review with management the Company's compliance program,
material litigation affecting the Company and any significant correspondences
with, or other actions by, regulators or governmental agencies.

5. <u>Assess Risk Management Competency</u>. At least annually, the Risk Committee
shall review with management the quality and competence of management
appointed to administer risk management functions.

*       *       *

36.     Colony also maintains an Audit Committee that has its own Charter. This Charter

requires that the Audit Committee review with management and the Company's independent

auditor the Company's annual and quarterly SEC filings and other communications, and also that

the "…Audit Committee shall discuss the Company's earnings press releases, as well as financial

information and earnings guidance provided to analysts and ratings agencies…". The Audit

Committee Charter also provides in part:

> Review of Risk Management Policies. The Audit Committee, in consultation with
> Management, shall periodically review the Company's policies and procedures
> with respect to risk assessment and risk management, including key risks to which
> the Company is subject such as credit risk, liquidity risk and market risk, and the
> steps that Management has taken to monitor and control exposure to such risks, and
> shall periodically report its findings to the Board.

> Code of Business Conduct and Ethics; Code of Ethics for Principal Executive
> Officer and Senior Financial Officers. The Audit Committee will consider and act
> upon any amendments to the Code and the Code for Senior Financial Officers
> (together, the "Codes"), and upon any request by persons subject to the Codes for
> waivers under the Codes.

37.     Colony also maintains a Nominating and Corporate Governance Committee. Its

Charter provides in relevant part:

> Corporate Governance Guidelines; Code of Business Conduct and Ethics. The
> Nominating Committee shall develop and recommend to the Board a set of

13

corporate governance guidelines applicable to the Company and code of business conduct and ethics applicable to employees, officers and directors of the Company. The Nominating Committee periodically (but not less than annually) shall review the corporate governance guidelines and code of business conduct and ethics and recommend changes as necessary to the Board.

Board Operations and Compliance. The Nominating Committee, at least annually and more frequently as it deems necessary or appropriate, shall review and make recommendations to the Board concerning the general operations of the Board, including its size and composition. The Nominating Committee also shall (i) advise the Board periodically with respect to the Company's compliance with its corporate governance guidelines and applicable laws and regulations, including the applicable NYSE listing requirements, (ii) consider corporate governance issues that arise from time to time and make recommendations to the Board with respect thereto (including on any remedial or corrective actions to be taken) and (iii) oversee and review on a periodic basis the orientation program for new Directors, as the Nominating Committee may deem appropriate.

## RELEVANT FACTS

38.     Colony operates as a real estate investment trust. The Company invests in healthcare, industrial, and hospitality sectors, as well as offers equity and debt management services. Colony serves customers globally. The Company resulted from the January 2017 merger of three entities: Colony Capital, Inc. ("Colony Capital"); NorthStar Asset Management Group Inc. ("NorthStar Asset"); and NorthStar Realty Finance Corp. ("NorthStar Realty").  This merger included the Townsend Group ("Townsend").   NorthStar Asset acquired a majority stake of Townsend in 2015.

39.     The merger was designed to cure a perceived valuation problem through the addition of an embedded investment management ("IM") business and the regular fees earned from managing other investors' capital.  However, new regulations implemented on or about April 2016 (through Financial Industry Regulatory Authority ("FINRA") and National Association of Securities Dealer ("NASD")) required more transparent fee-related disclosures for non-traded Real Estate Investment Trusts ("REIT") (such as the funds in which defendants would seek third-party

14

capital). These changes impacted the way non-traded REIT investment values were reported on customer account statements.  The new rules required that the statements either list the security purchase price less any fees or commissions or, in the alternative, list a current value for the security. Before the rule change, account statements could simply identify a security's gross purchase price even though commissions and fees could have significantly eroded its value over time. The new fee disclosure requirements created downward pressure on fees throughout the industry while also causing significant reductions in third-party fundraising.

40.     On January 10, 2017, the Company issued a press release announcing the completion of the Merger (the "January 2017 Press Release"). In the January 2017 Press Release, Hamamoto stated that the Merger would benefit Colony's combined stockholders "'with an even stronger value proposition through enhanced relationships, substantial efficiencies and synergies and greater scale in established, durable real estate and investment management business with broad-based capital access and investment opportunities.'" The January 2017 Press Release also touted the combined Company's investment management platform:

> World-Class Real Estate and Investment Management Platform:
>
> Global, diversified equity REIT with $58 billion of assets under management, led by a seasoned management team with access to proprietary deal sourcing and a strong track record as a global investor, operator and investment manager.

41.     The January 2017 Press Release additionally described the strong balance sheet and improved liquidity of the combined Company:

> Stronger Balance Sheet and Improved Liquidity: Approximately $24 billion balance sheet with significant excess liquidity expected from near term asset monetizations which can be redeployed into new investments, to repurchase stock and/or to deleverage; targeting total debt-to capitalization ratio of 50% or less with the goal of upgrading corporate credit profile and lowering overall cost of capital.

42.     On January 25, 2017, Colony filed a Form 8-K with the SEC (the "January 2017 8-

K") regarding the Company's "previously announced sale of an 18.7% interest in the Company's healthcare real estate portfolio . . . to Derwood Limited, in exchange for $350,000,000." The January 2017 8-K stated that the Company's healthcare real estate portfolio "is currently comprised of the Company's ownership interest, excluding existing minority interest holders, in 191 senior housing properties, 113 medical office properties, 14 hospitals and 107 skilled nursing facilities . . . represent[ing] an implied valuation . . . of approximately $5.4 billion[.]" The January 2017 8-K included the related "Purchase and Sale Agreement" and the "Unaudited Pro Forma Condensed Consolidated Financial Statements of Colony NorthStar[.]" The Unaudited Pro Forma Consolidated Balance Sheet, as of September 30, 2016, valued the combined Company's "Goodwill" at $1,063,028,000. The January 2017 8-K was signed by Tangen.

43.     On February 6, 2017, the Company issued a press release announcing that it would "release fourth quarter 2016 financial and operating results of its predecessor, NorthStar Asset[,] . . . after the market close on Tuesday, February 28, 2017[,]" along with "fourth quarter 2016 financial and operating results for Colony Capital . . . and NorthStar Realty[,] . . . which completed their merger with [NorthStar Asset] in January 2017 to create Colony NorthStar, a leading global real estate and investment management firm."

44.     Then, on February 28, 2017, Colony issued a press release, entitled "Colony NorthStar Announces Fourth Quarter 2016 Financial Results and Post-Merger Update," cutting "Core [Funds From Operations ("FFO")] guidance for the year ending 2017 to a range of $1.40 to $1.58 per share" and announcing it did "not intend to provide updates to Core FFO guidance going forward." The Company expected lower earnings due to:

1) less third party capital raising; 2) less cash available to deploy into investments resulting from the increase of the [NorthStar Asset] special dividend among other reasons; and 3) accelerating the replacement of higher-yielding, non-core investments with lower-yielding investments that better fit the strategic direction of

16

the Company.

45.     That same day, the Company filed its annual report with the SEC for the fiscal year ended December 31, 2016 on Form 10-K (the "2016 10-K"), which provided the Company's annual financial results and position. The 2016 10-K was signed by Defendant Saltzman, and Tangen, Redington, and Hamamoto. The 2016 10-K also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendant Saltzman and Tangen attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

46.     The 2016 10-K discussed the Company's five core strategic real estate segments, including its Healthcare and Investment Management segments:

Colony NorthStar segments

Our business objective is to provide attractive risk-adjusted returns to our investors through five core strategic real estate segments summarized as follows:

• Healthcare - Our healthcare properties are comprised of a diverse portfolio of medical office buildings, senior housing, skilled nursing and other healthcare properties. Over half of our healthcare properties are medical office buildings and properties structured under a net lease to healthcare operators. Substantially all of our net leases include annual escalating rent provisions. In addition, our portfolio consists of senior housing operating facilities which include healthcare properties that operate through management agreements with independent third party operators, predominantly through structures permitted by the REIT Investment Diversification and Empowerment Act of 2007, or RIDEA, structures that permit us, through a taxable REIT subsidiary, or TRS, to have direct exposure to resident fee income and incur customary related operating expenses. Our medical office buildings are a combination of single tenant and multi-tenant properties typically structured with long-term leases with the tenants.

*　　*　　*

- Investment Management - Our investment management business is expected to generate fee income through investment management services, sponsoring numerous investment products across a diverse set of institutional and retail investors.

47. On May 10, 2017, the Company filed a Form 10-Q with the SEC for the quarter ended March 31, 2017 (the "1Q 2017 10-Q"), which provided the Company's first quarter 2017 financial results and position. The 1Q 2017 10-Q was signed by Defendant Saltzman, and Tangen, and Redington.

48. The 1Q 2017 10-Q contained signed SOX certifications by Defendant Saltzman and Tangen attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

49. The 1Q 2017 10-Q discussed the Company's five reportable segments, including Healthcare and Investment Management, stating, in relevant part:

- Healthcare—The Company's healthcare segment is composed of a diverse portfolio of medical office buildings, senior housing, skilled nursing and other healthcare properties. The Company earns rental income from medical office buildings and properties structured under net leases to healthcare operators, and resident fee income from senior housing operating facilities that operate through management agreements with independent third-party operators.

*　　*　　*

- Investment Management—The Company generates fee income through investment management services, sponsoring numerous investment products across a diverse set of institutional and retail investors.

50. The Company further described its Healthcare segment interests in the 1Q 2017 10-Q, stating, in relevant part:

Healthcare

\*        \*        \*

In connection with our on-going sales initiative, subsequent to the Merger, we closed on the sale of an 18.7% noncontrolling interest in our healthcare real estate portfolio through a newly formed joint venture for $350 million (including $20 million of certain pre-funded capital items). Our healthcare joint venture in turn owns approximately 87.7% of our healthcare portfolio, with the remaining 12.3% owned by existing minority interest holders. We act as the manager of our healthcare joint venture and are responsible for the day-to-day business and affairs of our healthcare portfolio.

At March 31, 2017, our interest in our healthcare segment was approximately 71.3%.

Our healthcare portfolio is located across 33 states domestically and 10% of our portfolio (based on facility count) is in the United Kingdom. The following table presents selected operating metrics of our healthcare segment at March 31, 2017:

| Type | Number of Properties / Facilities | Capacity | | Average Occupancy [1] | Average Remaining Lease Term (Years) | NOI for the Three Months Ended March 31, 2017 (in thousands) |
|---|---|---|---|---|---|---|
| Medical office buildings | 113 | 4.02 million | square feet | 85.1% | 5.1 | $    11,974 |
| Senior housing—operating | 109 | 6,436 | units | 86.8% | NA | 16,314 |
| Net lease—senior housing | 82 | 4,065 | units | 85.7% | 11.5 | 12,461 |
| Net lease—skilled nursing facilities | 107 | 12,794 | beds | 84.2% | 7.6 | 25,384 |
| Net lease—hospitals | 14 | 817 | beds | 60.9% | 12.0 | 4,995 |
| Total | 425 | | | 83.6% | 9.5 | $    71,128 |

[1] Occupancy represents property operator's patient occupancy for all types except medical office buildings. Average occupancy is based on number of units, beds or square footage by type of facility. Occupancy percentage is as of the last day of the quarter presented for medical office buildings, average of the quarter presented for senior housing—operating, and average of the prior quarter for net lease properties.

\*        \*        \*

Subsequent to the Merger, we sold one medical office building for net proceeds of $3.1 million. At March 31, 2017, we had one portfolio and two skilled nursing facilities held for sale, with an aggregate real estate carrying value of $228.6 million and corresponding debt carrying value of $150.7 million. These activities reflect our continued asset monetization initiatives.

51.     The Company further described in its 1Q 2017 10-Q its Investment Management

segment and the extent to which NorthStar Asset contributed to this segment, stating in relevant

part:

Investment Management

We manage capital on behalf of third party institutional and retail investors through private funds, traded and non-traded REITs and investment companies, which provide a stable stream of management fee income. We also have an embedded broker-dealer platform which raises capital in the retail market.

Our investment management platform allows us to raise private third party capital in partnership with our own balance sheet to further scale our core real estate segments and also allows us to pursue a balance sheet light tactical strategy.

For the three months ended March 31, 2017, we closed on approximately $980 million of third party capital commitments, with $940 million from institutional clients and $40 million from retail clients.

Total third-party assets under management ("AUM") were as follows:

| (In billions) | March 31, 2017 | December 31, 2016 |
|---|---|---|
| Third party AUM [(1)] | $40.7 | $10.7 |

The acquisition of [NorthStar Asset]'s investment management business contributed $30.9 billion of our third party AUM at March 31, 2017. In the first quarter of 2017, Colony's third party AUM decreased approximately $0.9 billion, due to continued realization of investments by liquidating funds, including the sale of shares in Colony Starwood Homes held by our managed funds, partially offset by new capital raised during this period.  Our third party AUM at March 31, 2017 by type is summarized below:

| Type | Products | Description | AUM (in billions) |
|---|---|---|---|
| Institutional Funds | Credit funds, opportunistic funds, value-add funds, Colony industrial open end fund, other co-investment vehicles and special accounts | Earns base and asset management fees, potential for incentives on sponsored funds | $  10.2 |
| Retail Companies | NorthStar Income I, NorthStar Income II | Public non-traded REITs and investment companies | 7.0 |
|  | NorthStar Healthcare | Broker-dealer subsidiary acts as dealer-manager for all retail product offerings |  |
|  | NorthStar/RXR NY Metro [1] | Earns base management fees from all Retail Companies, acquisition and disposition fees from non-traded REITs (except for NorthStar/RXR NY Metro), and potential for performance fees (except for NorthStar/Townsend) |  |
|  | NorthStar Capital Fund |  |  |
|  | NorthStar/Townsend [1][2] |  |  |
| Public Companies | NorthStar Realty Europe Corp. | NYSE-listed European equity REIT | 2.0 |
|  |  | Earns base management fees, potential for incentives |  |
| Townsend | Commingled funds, segregated mandates, advisory services | 84% interest in Townsend group | 14.5 |
|  |  | Manage fund-of-funds and custom portfolios primarily invested in direct real estate funds |  |
|  |  | Source co-investments and joint ventures alongside GPs |  |
|  |  | Earns base management fees, performance fees, advisory fees |  |
| Pro Rata Corporate Investments | Joint venture investments | Earns share of earnings from unconsolidated ventures | 7.0 |
|  |  | Includes investments in RXR Realty (27%), real estate owner, developer and asset manager with AUM over $12 billion; and (ii) AHI (43%), healthcare asset manager and sponsor of non-traded vehicles with AUM of $2.5 billion |  |
|  |  |  | $  40.7 |

52.     On August 9, 2017, the Company filed a Form 10-Q with the SEC for the quarter ended June 30, 2017 (the "2Q 2017 10-Q"), which provided the Company's second quarter 2017 financial results and position. The 2Q 2017 10-Q was signed by Defendant Saltzman, and Tangen, and Redington.

53.     The 2Q 2017 10-Q contained signed SOX certifications by Defendant Saltzman and Tangen attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

54.     The 2Q 2017 10-Q discussed the Company's desire to sell certain Healthcare segment assets, stating, in relevant part:

Healthcare

*        *        *

In connection with our on-going sales initiative, subsequent to the Merger, we closed on the sale of an 18.7% noncontrolling interest in our healthcare real estate portfolio through a newly formed joint venture for $350 million (including $20 million of certain pre-funded capital items). Our healthcare joint venture in turn owns approximately 87.7% of our healthcare portfolio, with the remaining 12.3% owned by existing minority interest holders. We act as the manager of our healthcare joint venture and are responsible for the day-to-day business and affairs

21

of our healthcare portfolio.

At June 30, 2017, our interest in our healthcare segment was approximately 71.3%.

Our healthcare portfolio is located across 33 states domestically and 10% of our portfolio (based on property count) is in the United Kingdom.

The following table presents selected operating metrics of our healthcare segment:

| Type | Number of Buildings at June 30, 2017 | Capacity at June 30, 2017 | | Average Occupancy[1] | Average Remaining Lease Term (Years) | NOI for the Three Months Ended June 30, 2017 (In thousands) | NOI for the Six Months Ended June 30, 2017 (In thousands) |
|---|---|---|---|---|---|---|---|
| Medical office buildings | 113 | 4.02 million | square feet | 84.0% | 5.0 | $ 14,408 | $ 26,382 |
| Senior housing—operating | 109 | 6,436 | units | 86.7% | N/A | 19,418 | 35,732 |
| Net lease—senior housing | 82 | 4,065 | units | 83.6% | 11.3 | 14,407 | 26,868 |
| Net lease—skilled nursing facilities | 107 | 12,794 | beds | 83.4% | 7.7 | 24,904 | 50,288 |
| Net lease—hospitals | 14 | 872 | beds | 63.4% | 11.9 | 5,375 | 10,370 |
| Total | 425 | | | 83.0% | 9.4 | $ 78,512 | $ 149,640 |

\*       \*       \*

Subsequent to the Merger, we sold one medical office building for net proceeds of $3.1 million. At June 30, 2017, we had one portfolio, five medical office buildings and two skilled nursing facilities held for sale, with an aggregate real estate carrying value of $228.8 million and corresponding debt carrying value of $168.7 million. These activities reflect our continued asset monetization initiatives.

55.     The Company further described in its 2Q 2017 10-Q its Investment Management segment and the extent to which NorthStar Asset contributed to this segment, stating, in relevant part:

Investment Management

We manage capital on behalf of third party institutional and retail investors through private funds, traded and non-traded REITs and investment companies, which provide a stable stream of management fee income. We also have an embedded broker-dealer platform which raises capital in the retail market.

Our investment management platform allows us to raise private third party capital in partnership with our own balance sheet to further scale our core real estate segments and also allows us to pursue a balance sheet light tactical strategy.

For the six months ended June 30, 2017, we closed on approximately $1.4 billion of third party capital commitments, including our pro rata share from equity method investments in third party asset managers.

Our total third party assets under management ("AUM") were as follows:

22

| (In billions) | June 30, 2017 | December 31, 2016 |
|---|---|---|
| Third party AUM [1] | $40.3 | $10.7 |

The acquisition of [NorthStar Asset]'s investment management business contributed $30.7 billion of our third party AUM at June 30, 2017. In the six months ended June 30, 2017, Colony's third party AUM decreased $1.1 billion, due to continued realization of investments by liquidating funds, including the sale of shares in SFR held by our managed funds.  Our third party AUM at June 30, 2017 by type is summarized below:

| Type | Products | Description | AUM (in billions) |
|---|---|---|---|
| Institutional Funds | Credit funds, opportunistic funds, value-add funds, Colony industrial open end fund, other co-investment vehicles and special accounts | Earns base and asset management fees, potential for incentives on sponsored funds | $ 10.0 |
| Retail Companies | NorthStar Income I, NorthStar Income II | Public non-traded REITs and investment companies | 6.9 |
| | NorthStar Healthcare | Broker-dealer subsidiary acts as dealer-manager for all retail product offerings | |
| | NorthStar/RXR NY Metro [1] | Earns base management fees from all retail companies, acquisition and disposition fees from non-traded REITs (except for NorthStar/RXR NY Metro), and potential for performance fees (except for NorthStar/Townsend) | |
| | NorthStar Capital Fund | | |
| | NorthStar/Townsend [1] [2] | | |
| Public Companies | NorthStar Realty Europe Corp. | NYSE-listed European equity REIT | 2.1 |
| | | Earns base management fees, potential for incentives | |
| Townsend [3] | Commingled funds, segregated mandates, advisory services | 84% interest in Townsend group | 14.2 |
| | | Manage fund-of-funds and custom portfolios primarily invested in direct real estate funds | |
| | | Source co-investments and joint ventures alongside GPs | |
| | | Earns base management fees, performance fees, advisory fees | |
| Pro Rata Corporate Investments | Joint venture investments | Earns share of earnings from unconsolidated ventures | 7.1 |
| | | Includes investments in RXR Realty (27% interest), a real estate owner, developer and asset manager with AUM over $12 billion; and AHI (43% interest), a healthcare asset manager and sponsor of non-traded vehicles with AUM of $2.9 billion | |
| | | | $ 40.3 |

56.     On September 1, 2017 the Company announced that it entered into a definitive agreement to sell Townsend.  In its press release, Saltzman claimed "…by the closing of the Colony Capital/NorthStar merger in January of this year, it became clear that the market perceived a conflict with Colony's institutional investment management business. For these reasons, Colony NorthStar's sale of Townsend to Aon is a winning outcome for all three organizations."

57.     What Saltzman did not share in that press release was that Townsend was losing customers and subjected to at least one customer lawsuit to recover fees and based on Townsend's alleged failure to adequately advise its customer regarding its real estate investments.

58.     On November 9, 2017, the Company filed a Form 10-Q with the SEC for the quarter

#3156339v.1

ended September 30, 2017 (the "3Q 2017 10-Q"), which provided the Company's third quarter 2017 financial results and position. The 3Q 2017 10-Q was signed by Defendant Saltzman, and Tangen, and Redington.

59.     The 3Q 2017 10-Q contained signed SOX certifications by Defendant Saltzman and Tangen attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

60.     The 3Q 2017 10-Q discussed the Company's desire to sell certain "non-core" Healthcare segment assets, stating, in relevant part:

Investment Management

We manage capital on behalf of third party institutional and retail investors through private funds, traded and non-traded REITs and investment companies, which provide a stable stream of management fee income. We also have an embedded broker-dealer platform which raises capital in the retail market.

Our investment management platform allows us to raise private third party capital in partnership with our own balance sheet to further scale our core real estate segments and also allows us to pursue a balance sheet light tactical strategy.

For the nine months ended September 30, 2017, we closed on approximately $1.7 billion of third party capital commitments, including our pro rata share from equity method investments in third party asset managers.

Our total third party assets under management ("AUM") were as follows:

| (In billions) | September 30, 2017 | December 31, 2016 |
|---|---|---|
| Third party AUM [(1)] | $41.7 | $10.7 |

The acquisition of [NorthStar Asset]'s investment management business, including Townsend and NSAM's investments in third party asset managers, contributed $31.5 billion of our third party AUM at September 30, 2017. Colony's third party AUM of $10.2 billion at September 30, 2017 decreased $0.4 billion from December 31, 2016 due to continued realization of investments by liquidating funds, including the sale of shares in SFR held by our managed funds, partially offset by the July 2017 acquisition of the THL Hotel Portfolio which is co-invested with our managed funds, as well as the acquisition and subsequent syndication of a California office building investment to third party investors in September 2017.

24

61.     That same day, the Company held an earnings call for the third quarter of 2017. On the call, Tangen stated that the Company "ended the quarter with a slightly smaller healthcare portfolio, 417 properties compared to 425 last quarter as a result of our ongoing selective portfolio pruning."

62.     On November 9, 2017, the Company also announced that Hamamoto had delivered his voluntary resignation from all director and officer positions held with the Company and any of its affiliates, with an effective date of January 10, 2018.   On information and belief, in approximately December 2017 Hamamoto sold over 2.2 million of his Colony shares, and received nearly $27 million at the expense of the Company's unsuspecting shareholders.

63.     The statements referenced above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business, operational, and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Colony's Healthcare and Investment Management segments were performing worse than reported; and (ii) as a result, Colony's public statements were materially false and misleading at all relevant times.

## THE TRUTH BEGINS TO EMERGE

64.     On March 1, 2018, the Company filed its annual report with the SEC for the fourth quarter and full year ended December 31, 2017 ("2017 10-K"), which announced a goodwill impairment of $375 million attributable to the Company's Investment Management segment. Specifically, the Company's impaired goodwill related to its investment management reporting unit, NorthStar Healthcare, and NorthStar/RXR. The 2017 10-K stated, in relevant part:

> Investment Management—The impairment recognized in 2017 consisted of the following:

• $316.0 million write-down in goodwill, which represents the excess in carrying value of our investment management reporting unit, including its assigned goodwill, over its estimated fair value . . .; and

• write-down of management contract intangibles for non-traded REITs that were acquired through the Merger, specifically $55.3 million for NorthStar Healthcare . . . based on an amendment to its advisory agreement as part of our efforts to preserve liquidity in NorthStar Healthcare and $3.7 million for NorthStar/RXR . . . based on revised capital raising projections.

65.     During the earnings call held that same day, Defendant Saltzman stated, in relevant part:

On the other hand, our earnings performance has not lived up to expectations, emanating from more challenging industry conditions in health care, real estate as well as our retail broker dealer distribution business.

\*       \*       \*

Retail broker-dealer distribution was another area of very disappointing results. The industry generally remains [in] an enormous transition from major regulatory headwinds, including the newly implemented fiduciary rule as well as a change in product constructs, more conservative 40 Act and interval funds that operate with less leverage and offer more liquidity options.

66.     Further, during the same earnings call, Tangen stated, in relevant part:

A few material accounting items to mention during the fourth quarter that impacted our GAAP results: We recorded a goodwill impairment of $316 million to reflect a lower value in our investment management business, primarily attributable to our retail broker-dealer distribution business. And we also wrote down management agreement intangible assets by $35 million to reflect amendments to our management agreement in our health care non-traded REIT, NHI, net of deferred tax impact.

67.     On this news, Colony's share price fell $1.78, or 22.88%, to close at $6.00 on March 1, 2018.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS
## AGAINST THE DIRECTOR DEFENDANTS

68.     Plaintiff brings this action derivatively in the right and for the benefit of Colony to

redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Director Defendants.

69.     Plaintiff will adequately and fairly represent the interests of Colony and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

70.     Plaintiff is a current owner of Colony stock and has continuously been an owner of Colony stock during all times relevant to Defendants' wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

71.     Because of the facts set forth throughout this Complaint, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

72.     The Colony Board is currently comprised of ten (10) members – Defendants Barrack, Saltzman, Crocker, Curtin, Fosheim, Metz, Parker, Schoenherr, Somers, and Steffens. Thus, Plaintiff is required to show that a majority of the Director Defendants, *i.e.*, five (5), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

73.     The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

74.     The Director Defendants cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiff has not made (and should

27

be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

75.     Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's shareholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

76.     Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein and profited by it, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

77.     Because of their participation in the gross dereliction of director duties, and breaches of the duties of due care, good faith, and loyalty, the Director Defendants are unable to comply with their director duties and prosecute this action.

## THE DIRECTOR DEFENDANTS ARE NOT INDEPENDENT OR ARE PERSONALLY AND DIRECTLY COMMITTED TO THE DECISION IN DISPUTE

### Defendant Barrack

78.     Defendant Barrack is not disinterested or independent, and therefore, is incapable of considering demand because Barrack, as Executive Chairman, is an employee of the Company who derives substantially all of his income from his employment with Colony, making him not independent.  In its 2018 DEF 14A Colony acknowledges that Barrack is not independent.

79.     Additionally, Defendant Barrack was so entrenched in his commitment to the January 2017 merger that he failed to evaluate each component of this merger and specifically the value, business, and revenue contribution of Townsend, particularly in light of the above

28

mentioned change in rules and regulations.

80.     Defendant Barrack's failures are exemplified by the conduct of Hamamoto, who in December 2017 sold over 2.2 million of his Colony shares, and received nearly $27 million at the expense of the Company's unsuspecting shareholders.

81.     Therefore, Defendant Barrack faces a substantial likelihood of liability for his breach of director duties and any demand upon him is futile.

**Defendant Saltzman**

82.     Defendant Saltzman is not disinterested or independent, and therefore, is incapable of considering demand because Saltzman, as President and CEO, is an employee of the Company who derives substantially all of his income from his employment with Colony, making him not independent.  In its 2018 DEF 14A Colony acknowledges that Saltzman is not independent.

83.     Additionally, Defendant Saltzman was so entrenched in his commitment to the January 2017 merger that he failed to evaluate each component of this merger and specifically the value, business, and revenue contribution of Townsend, particularly in light of the above mentioned change in rules and regulations.

84.     Defendant Saltzman's failures are exemplified by the conduct of Hamamoto, who in December 2017 sold over 2.2 million of his Colony shares, and received nearly $27 million at the expense of the Company's unsuspecting shareholders.

85.     Therefore, Defendant Saltzman faces a substantial likelihood of liability for his breach of director duties and any demand upon him is futile.

**Defendants Crocker, Curtin, Metz, and Somers**

86.     As members of Colony's Risk Committee, Defendants Crocker, Curtin, Metz, and Somers were required to evaluate the Company's risk appetite, monitor its risk exposure and assess

its risk management competency.  These Defendants failed to meet their responsibilities as members of this committee by failing to consider the impact of the above mentioned new rules and regulations, and how these changes would impact the Company's projections, and in particular its investment management business, and its ability to raise capital.

87.    Additionally, these Defendants were so entrenched in their commitment to the January 2017 merger that each failed to evaluate each component of this merger and specifically the value, business, and revenue contribution of Townsend, particularly in light of the above mentioned change in rules and regulations.

88.    The failures of each of these Defendants is exemplified by the conduct of Hamamoto, who in December 2017 sold over 2.2 million of his Colony shares, and received nearly $27 million at the expense of the Company's unsuspecting shareholders.

89.    Therefore, Defendants Crocker, Curtin, Metz, and Somers face a substantial likelihood of liability for their breach of director duties and any demand upon them is futile.

**Defendants Crocker, Fosheim, Parker, and Schoenherr**

90.    During the Relevant Period, Defendants Crocker, Fosheim, Parker, and Schoenherr served as members of the Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company, and otherwise meet their responsibilities as set forth in the Audit Committee Charter as set forth herein.

91.    Defendants Crocker, Fosheim, Parker, and Schoenherr breached their director duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and

other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting and business reporting issues and deficiencies described above.

92.     Additionally and like the members of Colony's Risk Committee, these Defendants were so entrenched in their commitment to the January 2017 merger that each failed to evaluate each component of this merger and specifically the value, business of Townsend, particularly in light of the above mentioned change in rules and regulations.  As a result, Colony sold Townsend at a loss, and just nine (9) months after the close of the January 2017 merger.

93.     The failures of each of these Defendants is exemplified by the conduct of Hamamoto, who in December 2017 sold over 2.2 million of his Colony shares, and received nearly $27 million at the expense of the Company's unsuspecting shareholders.

94.     Therefore, Defendants Crocker, Fosheim, Parker, and Schoenherr face a substantial likelihood of liability for their breach of director duties and any demand upon them is futile.

## FIRST CAUSE OF ACTION

### Against The Director Defendants for Breach of Duties

95.     Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

96.     The Director Defendants owe Colony the duty to act in good faith, in a manner the director reasonably believes to be in the best interests of the corporation, and with the care that an ordinarily prudent person in a like position would use under similar circumstances.

97.     The Director Defendants violated and breached their duties of care, loyalty, reasonable inquiry, and good faith.

98.     The Director Defendants engaged in a sustained and systematic failure to properly exercise their duties.  Among other things, the Director Defendants breached their duties of loyalty

31

and good faith by allowing the Company to improperly misrepresent and overstate the benefits of its merger, its capital raising projections, and dividend guidance.  These actions could not have been a good faith exercise of prudent judgment to protect and promote the Company's corporate interests.

99.     As a direct and proximate result of the Director Defendants' failure to perform their obligations, Colony has sustained significant damages.  As a result of the misconduct alleged herein, the Director Defendants are liable to the Company.

100.     As a direct and proximate result of the Director Defendants' breach of their duties, Colony has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of Colony, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### Against The Director Defendants for Gross Mismanagement

101.     Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

102.     By their actions alleged herein, the Director Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and duties with regard to prudently managing the assets and business of Colony in a manner consistent with the operations of a publicly held corporation.

103.     As a direct and proximate result of the Director Defendants' gross mismanagement and breaches of duty alleged herein, Colony has sustained significant damages in excess of hundreds of millions of dollars.

32

104.    Because of the misconduct and breaches of duty alleged herein, the Director Defendants are liable to the Company.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all the Director Defendants and in favor of Colony, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.    Directing Colony to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, interest, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: October 12, 2018

/S/ John B. Isbister
John B. Isbister (Bar No. 00639)
Jaime W. Luse (Bar No. 27394)
Tydings & Rosenberg LLP
One East Pratt Street
Suite 901
Baltimore, MD 21202
Telephone: (410) 752-9700
Facsimile: (410) 727-5460
Email: jisbister@tydingslaw.com
Email: jluse@tydingslaw.com


Thomas J. McKenna
Gregory M. Egleston
**GAINEY McKENNA & EGLESTON**
440 Park Avenue South, 5th Floor
New York, New York 10016
Telephone: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Counsel for Plaintiff*

#3156339v.1